***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan, and the briefs and oral arguments before the Full Commission. The appealing parties have shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award in part as to plaintiffs' appeal, affirms the Deputy Commissioner's Opinion and Award in part as to defendants' appeal, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant Liberty Mutual Fire Insurance was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The date of injury is February 27, 2003.
5. Decedent's average weekly wage was $316.47, which yields a compensation rate of $210.99 per week, pursuant to a Form 22 Wage Chart submitted by defendants on June 9, 2003.
6. The sole issue for determination is: Whether the medical treatment received by decedent in November 2003 is related to his compensable accident of February 27, 2003.
7. The parties stipulated the following documentary evidence:
a. Stipulated Exhibit #1: Pre-Trial Agreement
b. Stipulated Exhibit #2: I.C. Forms
c. Stipulated Exhibit #3: Medical Records
d. Stipulated Exhibit #4: Carrier File
e. Stipulated Exhibit #5: Additional Medical Records
f. Stipulated Exhibit #6: Personnel File and Discovery Responses
8. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
a. Subsequent to the hearing before the Deputy Commissioner, plaintiffs provided a letter from defendant-carrier to plaintiffs dated May 28, 2003, which is hereby entered into evidence and made part of the record as Plaintiffs' Exhibit #1.
b. By letter dated October 22, 2004, plaintiffs' counsel advised the Deputy Commissioner that decedent in this case had died on or about September 15, 2004. Accordingly, plaintiffs have submitted the following documents, which are hereby entered into the record as follows:
i. Plaintiffs' Exhibit #2: Death Certificate
ii. Plaintiffs' Exhibit #3: Form 42, Application for Appointment of Guardian Ad Litem, approved by the undersigned on November 3, 2004.
c. Defendants' Exhibit #1: Medical records received by the parties subsequent to the hearing before the Deputy Commissioner, which are hereby entered into the record.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Decedent Terry Johnson was born on April 20, 1969, and had completed the ninth grade. On February 27, 2003, decedent was working for defendant-employer when he stepped off a conveyor belt onto an air hose and slipped, injuring his back. As a result of his injury by accident, decedent felt severe pain in his lower back radiating into his leg. Decedent had suffered a back injury requiring surgery in 1990; however, while he experienced mild chronic back pain, decedent had recovered sufficiently from the 1990 surgery to return to heavy construction work and manual labor.
2. On February 28, 2003, decedent presented to Dr. Alex Sanchez of CaroMont Occupational Medicine, who diagnosed decedent with an acute lumbar sacro strain and spasm. Although Dr. Sanchez did not perform any diagnostic tests such as x-rays, CT scan or MRI, he noted that there was no evidence of radiculopathy or herniated disc despite decedent's complaints of pain radiating down his leg. Dr. Sanchez prescribed pain medication and physical therapy and placed decedent on light duty with restrictions of no lifting over 15 pounds, no frequent bending or stooping, and no operating heavy equipment. He also required that decedent have alternate sitting and standing in his job.
3. Decedent returned to work at light duty and continued working full time making light fixtures. Decedent testified that he was able to do the job until his condition worsened on March 11, 2003.
4. Decedent was again seen by Dr. Sanchez on March 7, 2003, and decedent advised Dr. Sanchez that in order to stand his pain while at work it had been necessary for him to take two of the pain medication pills at a time. Decedent also advised Dr. Sanchez that the company did not follow Dr. Sanchez's limitations for light duty and that his back pain had become exacerbated. Dr. Sanchez noted that the decedent was complaining of pain in the left leg, however, his diagnoses of acute lumbo sacro strain remained unchanged. Dr. Sanchez gave the decedent a prescription for Tylox #30 to be taken one every six hours. There would be no refills. Decedent was a given a prescription for physical therapy to start at three times a week for two weeks with ultrasound, electrical stimulation and other modalities. Decedent was scheduled to follow up with Dr. Sanchez in three weeks.
5. On the morning of March 11, 2003, decedent awoke in extreme pain and had difficulty putting on his shoes. Decedent called the defendant-employer and advised that he would not be able to come into work due to his pain but that he was scheduled to be at Optima Therapies for physical therapy at 11:00 a.m. and that if it decreased his pain he would come into work thereafter. He was ordered by the defendant-employer to come in after physical therapy no matter what his condition was. At Optima Therapies, the decedent complained that his symptoms were getting worse and that he had intermittent left lower extremity pain down to the mid gastroc area with intermittent tingling down the leg into the plantar aspect of the foot. The physical therapist noted significant lumbar paraspinal muscle tightness bilaterally. The decedent was advised by the physical therapist to perform prone lying extensions every 1 to 2 hours throughout the day for 3 or 5 minutes as he could tolerate it with two pillows under the chest if possible. He was to avoid sitting.
6. The decedent completed his March 11, 2003, physical therapy session and went to his employer as directed and advised the human relations manager, Karen Padgett, that he was in too much pain to perform any work. Ms. Padgett became angry and directed him to drive to Dr. Sanchez's office in another town immediately for an opinion as to whether he could work or not. Decedent drove to Dr. Sanchez's office and was seen and examined by Dr. Sanchez. Once again, the physical examination indicated signs of radiculopathy which were ignored by Dr. Sanchez. Dr. Sanchez, however, noted in his record two ex parte conversations on that date with defendant-employers' human resource manager regarding whether the decedent could perform the job offered decedent by defendant. Dr. Sanchez ordered the decedent to return to work, but increased the prescription for Diazepan to 10 mg to be taken one hour before bedtime.
7. On March 11, 2003, after the prescription for Diazepan was written by Dr. Sanchez to the decedent, Dr. Sanchez received a phone call from the pharmacy at Sentry Drugs in Lincolnton stating that the decedent had attempted to fill a prescription where the number "0" had been altered to the number "2" for refills. The pharmacy subsequently faxed a copy to Dr. Sanchez who compared it with the original and confirmed that the number of refills had been altered. The defendant-employer was advised of this occurrence. The decedent, at the hearing before the Deputy Commissioner, admitted that he had altered the prescription in order to get more pain medication. Decedent testified that Dr. Sanchez's treatment was failing to reduce his pain.
8. Karen Padgett, the human resource manager for defendant-employer, testified that the decedent was terminated on March 10, 2003, when the decedent reported to her after physical therapy and it appeared that his words were slurred and he was very sluggish. The slurring and sluggishness were a result of the prescribed drugs plaintiff was taking because of his pain from the compensable injury. Decedent was terminated because the witness, Karen Padgett, had met with the plant manager, the vice president of manufacturing, and decedent's supervisor and they all determined that decedent should be taken out of employment because they were concerned about his safety in the workplace and the safety of the employees around him. Once again, the safety concerns came from the effects of prescribed drugs from the compensable injury. Karen Padgett also testified that the decedent was terminated because he had accumulated more than 10 points in the absentee system, having accumulated 9 points before his compensable injury on February 27, 2003, and having incurred an additional point when he called in that he was unable to work. This 10th and critical point resulted from plaintiff's compensable injury. Karen Padgett further testified that the reason the decedent was terminated was due to the discovery that he had altered a prescription from Dr. Sanchez. However, the Full Commission finds that the prescription was not altered until March 11, 2003, a day after the decedent was terminated. The termination date of March 10, 2003, is confirmed by the employer's own records submitted to the Industrial Commission.
9. The defendants have argued that they discharged the decedent on March 10, 2003, as a result of his wrongful conduct by: (1) altering a prescription of the doctor for narcotic medication; (2) coming to work in an impaired condition as a result of taking narcotic medicine prescribed by his doctor and, thus, being unsafe to himself and co-workers; and, (3) failing to show up for work and, thus, violating defendant-employer's absentee policy. Defendants' argument for terminating decedent because he altered a prescription fails because the prescription was not altered until the day after plaintiff was terminated. And defendants' arguments for terminating decedent because of safety concerns and because of absenteeism also fail because defendant-employer has not shown that decedent was terminated for misconduct or fault unrelated to thecompensable injury for which a non-disabled employee would ordinarily have been terminated. The reasons put forward by defendants clearly resulted from the compensable injury. Thus, the Full Commission finds that decedent was terminated by defendant-employer for reasons related to his compensable injury.
10. On June 27, 2003, decedent was involved in a four-wheel all terrain vehicle accident. Decedent was rendered unconscious from the accident for a period of time and did not recall the specifics of the incident. Over the next seven days, he was treated at the Lincoln Medical Center and the Carolinas Medical Center for multiple facial and jawbone problems. During this treatment, decedent did not complain of back pain.
11. On September 16, 2003, decedent presented to Dr. John Welshofer for an independent medical evaluation authorized by defendants. Decedent presented with continuing complaints of low back pain radiating into his leg, which he related to the February 27, 2003, injury by accident. Dr. Welshofer diagnosed decedent with severe left sciatica and opined that decedent may have had a ruptured disk that was pinching the sciatic nerve down decedent's left leg. Dr. Welshofer recommended an MRI of decedent's spine and electrodiagnostic testing to determine whether there was nerve damage. These tests were not performed.
12. On October 30, 2003, decedent presented to the emergency room at Gaston Memorial Hospital complaining of severe lumbosacral back pain beginning in February 2003. The emergency room physician recommended immediate evaluation by either a specialized orthopedic surgeon or neurosurgeon and prescribed pain medication.
13. Decedent returned to the emergency room on November 8, 2003 with significant pain that was rendering him unable to move without difficulty. He was given an IV of pain medication. A lumber MRI revealed a large disc herniation at L5-S1 toward the left.
14. On November 10, 2003, decedent returned to Dr. Welshofer who reviewed the MRI and diagnosed decedent with a large ruptured disc at L5-S1 and severe left sciatica. Dr. Welshofer admitted decedent to Carolinas Medical Center and referred him to Dr. Mark Hartman for surgical decompression. Dr. Welshofer opined that decedent's symptoms were progressing and suggested that decedent was suffering from cauda equina, an emergency condition that could lead to immediate paralysis.
15. Dr. Welshofer opined that decedent's back condition was causally related to his February 27, 2003, injury and supported his opinion with the clinical notes provided by Dr. Sanchez. He discounted previous back problems suffered by decedent in 1991 due to the fact that decedent had been relatively symptom free prior to the February 2003 injury by accident. He further opined that the ATV accident in June 2003 had no bearing on decedent's back condition as those injuries were primarily to decedent's face and jaw. He explained that the lack of back pain complaints during that time was due to decedent's focus on his facial injuries and the medications he was given for the facial operations. Dr. Welshofer also stated that there were indications of the existence of the herniated disc during March and April 2003, as evidence by statements made by decedent to the physical therapist and Dr. Sanchez.
16. Dr. Hartman performed a left microdiskectomy for the L5-S1 left, herniated nucleus pulpous on November 11, 2003. Dr. Hartman opined that the ruptured disc was caused by the February 27, 2003, injury by accident. He also discounted the June 2003 ATV incident as a causal factor due to the location of decedent's injuries from that accident. Dr. Hartman further opined that decedent's prior back condition had resolved, and although decedent had received a 15% permanent partial disability rating following that surgery, he had returned to work relatively symptom free until the February 27, 2003, injury by accident.
17. Dr. Hartman continued to treat decedent until March 24, 2004, when he opined that decedent had reached maximum medical improvement. He released decedent with a 12% permanent partial disability rating to his back in addition to the previous 15% rating decedent received in 1991. Dr. Hartman also imposed permanent restrictions of no lifting or carrying over 30 pounds, no pushing or pulling over 50 pounds, and a change of positions every 45 minutes.
18. A January 13, 2004, note written by Dr. Carol Martin, who treated decedent for unrelated symptoms at Pathways Mental Health, states: "[Decedent] walks with a clearly disabling limp and ascribes it to his multiple surgeries following his most recent motor vehicle accident." There is no evidence regarding any motor vehicle accidents other than the ATV accident in June 2003, and any attempt to relate decedent's back condition to unknown automobile accidents is given no weight.
19. Subsequent to the closing of the record in this case by the Deputy Commissioner, the Industrial Commission was notified of decedent's death on or about September 15, 2004. The death certificate notes that the immediate cause of death is "Pending;" however, there is no claim in this case that decedent's death was related to the February 27, 2003, injury by accident and, thus, the Full Commission does not address this issue.
20. The Full Commission finds that defendants have unreasonably brought their appeal. It is therefore appropriate that the Full Commission award to plaintiffs appropriate attorney's fees in connection with plaintiffs' defense of the appeal. The Full Commission finds the reasonable costs of such to be $2,000.00 based upon the time spent, the experience of the lawyer involved, and the complexity of the issues raised.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Decedent sustained an injury by accident arising out of and in the course of the employment on February 27, 2004. As a result of the compensable injury, decedent suffered a ruptured disc at the L5-S1 level for which he required surgery, performed on November 11, 2003. N.C. Gen. Stat. § 97-2(6).
2. Defendants have failed to show that decedent's termination from employment with defendant-employer was attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Seagraves v. Austin Co. ofGreensboro, 123 N.C. App. 228, 472, S.E.2d 397 (1996). Therefore, plaintiff's termination does not constitute a constructive refusal to perform the work provided. Id. Decedent was terminated by defendant-employer for reasons related to his compensable injury, and is, thus, entitled to benefits pursuant to the Workers' Compensation Act. Id.
3. Decedent is entitled to temporary total disability compensation at the rate of $210.99 per week from March 10, 2003, the date he was wrongfully terminated by defendant-employer, until September 15, 2004, the date of his death. N.C. Gen. Stat. § 97-29.
4. Decedent is entitled to permanent partial disability compensation at the rate of $210.99 per week for 36 weeks (a total amount of $7,595.64), for the 12% permanent partial disability rating to his spine. N.C. Gen. Stat. § 97-31.
5. Decedent is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury that were required to provide relief, effect a cure or lessen the period of disability, including the treatment provided by Drs. Welshofer and Hartman, and the emergency room treatments provided between the release by Dr. Sanchez and the treatment of Dr. Hartman. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
6. Because defendants brought their appeal without reasonable grounds, the Full Commission may assess the whole cost of the proceedings, including reasonable fees for the plaintiffs' attorney, upon the party who has brought or defended them. The purpose of the statute providing for the award of attorney's fees to claimant is to prevent stubborn, unfounded litigiousness that is inharmonious with the primary purpose of Workers' Compensation Act, which is to provide compensation to injured workers. N.C. Gen. Stat. § 97-88.1; Chavis v. Thetford PropertyManagement, Inc., 155 N.C. App. 769, 573 S.E.2d 920 (2003).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiffs temporary total disability compensation at the rate of $210.99 per week from March 10, 2003, the date decedent was terminated by defendant-employer, until September 15, 2004, the date of his death, subject to the attorney's fee provided herein. Because this amount has accrued, defendants shall pay plaintiffs in lump sum.
2. Defendants shall pay to plaintiffs permanent partial disability compensation at the rate of $210.99 per week for 36 weeks (a total amount of $7,595.64), for the 12% permanent partial disability rating to decedent's spine, subject to the attorney's fee provided herein. Because this amount has accrued, defendants shall pay plaintiffs in lump sum.
3. Defendants shall pay for medical expenses incurred as a result of decedent's compensable injury that were required to provide relief, effect a cure or lessen the period of disability, including the treatment provided by Drs. Welshofer and Hartman, and the emergency room treatments provided between the release by Dr. Sanchez and the treatment of Dr. Hartman.
4. Defendants shall pay directly to plaintiffs' counsel a reasonable attorney's fee in the amount of 25% of the compensation awarded in paragraphs 1 and 2 of this Award. Because the compensation upon which this fee is based has accrued, defendants shall pay plaintiffs' counsel in lump sum.
5. Pursuant to N.C. Gen. Stat. § 97-88.1, defendants shall pay to plaintiffs a reasonable attorney's fee in the amount of $2,000.00 in connection with the plaintiffs' defense of this appeal.
6. Defendants shall pay the costs.
This 8th day of August 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER